■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALEXANDER VERRONE, Appellant. — Appeal by defendant (1) from a judgment of the County Court, Westchester County (Leggett, J.), rendered May 5, 1978, convicting him of rape in the first degree (three counts), sodomy in the first degree (three counts), robbery in the first degree, assault in the second degree (two counts), sexual abuse in the first degree (four counts), unlawful imprisonment in the first degree (five counts), attempted robbery in the first degree (two counts), criminal possession of stolen property in the third degree (two counts), and attempted robbery in the third degree, upon his plea of guilty, and imposing sentence; and (2) by permission, from an order of the same count (Nastasi, J.), dated March 8, 1982, denying his motion to vacate the aforesaid judgment pursuant to CPL 440.10. Judgment and order affirmed. On April 14, 1978, defendant, in the presence of counsel, voluntarily admitted that during a four-month period in 1976, he had abducted five Westchester girls, three of whom he had raped, sodomized or sexually abused. The youngest of defendant's victims was eight years of age. Prior to the entry of the guilty plea, the court, upon the request of defense counsel, ordered a competency hearing pursuant to CPL article 730. On appeal, defendant challenges the hearing court's designation of an additional psychiatrist to examine him and charges that the court's finding that defendant was competent to stand trial is against the weight of the credible evidence. At the outset, we note that a defendant does not waive his right to the mandated competency proceedings by entering a plea of guilty. There is an inherent contradiction in arguing that a defendant may be incompetent yet knowingly and intelligently waive his right to have a court determine his capacity to stand trial in accordance with the CPL (*People v Armlin,* 37 NY2d 167, 172; *People v Sinatra,* 89 AD2d 913, 915; *People v McCabe,* 87 AD2d 852, 853). Defendant contends that the court's selection of a third psychiatrist to examine him violates the statutory mandate of CPL 730.20 (subd 1), which directs that the examining psychiatrists be appointed by the director of a designated mental health facility (CPL 730.10, subd 4). Arguing that the selection of an expert witness by the trier of facts is inconsistent with the appearance of impartiality, defendant maintains that the testimony of the third psychiatrist should never have been received and that the matter should be remitted for a hearing *de novo* on the issue of competency. Upon review of the instant circumstances, however, we conclude that the claim that the hearing Judge exceeded his jurisdiction in appointing Abraham L. Halpern rather than allowing a "director" to designate the additional psychiatrist is spurious. The court's designation of Dr. Halpern was purely for defendant's own benefit, to afford him a further opportunity to overcome the presumption of competency, which was not rebutted by the testimony of the other two psychiatrists. In essence, the court acted with more solicitousness for defendant's rights than was statutorily required. Defendant's argument that strict compliance with the statute is mandated is belied by *People v Foster* (54 AD2d 595). In that case, the Third Department held that, where the record bore no indication that the defendant was in a state of idiocy, imbecility or insanity, he was not deprived of a full and impartial determination of his mental capacity to stand trial merely because he was examined by only one psychiatrist rather than two. At the competency hearing, all three examining psychiatrists testified regarding their findings and conclusions. Dr. Leslie Brooks was directed by the Westchester Community Health Services to perform a "730 Examination" of defendant at the Westchester County Jail. After examining defendant on two successive days for periods of 45 and 30

minutes, Dr. Brooks diagnosed defendant's condition as a psychotic depressive reaction and rendered the opinion that defendant was incompetent to sufficiently assist his attorney in his own defense. Upon further questioning, Dr. Brooks ventured that defendant's condition "could" interfere with his ability to consult with counsel. He made the following observation vis-à-vis defendant's capacity to assist counsel: "I think he might not feet [sic] terribly motivated to assist Counsel, that he would be too preoccupied with other things, that other thoughts would be going on within himself that he could feel that he could not assist you at something in his own interests". On cross-examination, Dr. Brooks admitted that he had not been thoroughly satisfied that defendant was telling him the truth. He also admitted the possibility that defendant was experiencing elements of the "ganza syndrome", a syndrome manifested by depression, confusion and other strange mental phenomena related to the stress of an imminent trial. Dr. Brooks admitted that, in his opinion, defendant was probably not as confused as he purported to be. Dr. Joseph Herson, who also rendered the opinion that defendant was incompetent, admitted that it was difficult to determine whether defendant was blocking out memories, was unable to remember, or was feigning loss of memory. Dr. Herson was unable to make any formal diagnosis of defendant's mental condition, but did label him a "grossly inadequate personality". Dr. Herson was unable to render an opinion on whether defendant's profound dysfunction would affect his ability to assist his attorney in evaluating testimony. In view of the indefiniteness of the doctors' testimony, the court, in the interest of justice, called upon a third psychiatrist, Dr. Abraham Halpern, to examine defendant and testify as to his findings. The hearing Judge rendered the following evaluation of Dr. Halpern's testimony which is supported by the record: "At the March 20, 1978 examination Dr. Halpern observed the Defendant to smile appropriately so long as the conversation was not related to the charges in the indictment. However, when the discussion went to the charges the defendant immediately withdrew from the conversation. The doctor observed selective recall in that the Defendant professed total lack of recall as to the circumstances of his arrest, but he was able to recall an alleged beating he received by the police at that time. Dr. Halpern was satisfied that the Defendant could understand the proceedings against him and also that he could assist in his defense. The doctor also questioned the defendant about the Court, the jury, and defense and prosecution attorney. He was satisfied with the answers given. The doctor also noted that the Defendant was afraid of his upcoming trial and was concerned with the effect of a 'guilty verdict.' This fear was a reasonable reaction anyone and, in fact, one would wonder about the competence of a defendant who was not concerned with a trial of this type. On April 2, 1978 Dr. Halpern found the Defendant to be more alert and responsive to the extent that he even discussed his honeymoon in Florida and the fact that he won a raffle. This change was attributed to the substantially reduced medication. Incidently, it tended to confirm one of the three alternatives for the 'memory gaps' as described by Dr. Herson. Dr. Halpern was questioned about the validity of the 'auditory hallucinations'. The Defendant would say one thing as to what the voices allegedly told him and then upon suggestion from the doctor he adopted the suggestions. Dr. Halpern and Dr. Herson both indicated that Melliril and Stelorzine can cause depression and this testimony is substantiated by the noticable [sic] improvement upon the reduction in the drug dosage. Dr. Halpern indicated that Melliril and Stelorzine are not used in the treatment of 'psychotic depression' thus, the Defendant was not being treated for any 'psychotic depression'. According to this witness the Defendant was able to answer questions about the non-sexual charges such as robbery and weapon possession, but he refused to admit he understood the sexual crimes. When

questioned by the doctor the Defendant denied knowing what rape was and he denied any understanding of that crime or how it could occur. But, when questioned by the doctor two days later concerning his own marriage and sex life, he gave responsive answers to those questions indicating he did, in fact, have a knowledge of sexual intercourse and the results thereof. It was the doctor's unequivocal conclusion that the Defendant was able to assist his counsel in his own defense and that he understood the proceedings against him." In view of the foregoing, we conclude that the court properly found that defendant did not lack the capacity to understand the proceedings against him or to assist in his own defense (CPL 730.10, subd 1). We have considered defendant's other contentions and find them to be without merit. Lazer, J. P., Gibbons, Weinstein and Niehoff, JJ., concur.